# United States District Court

**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| R.S., by and through his next friend, RUTH B., | § § | |
| Plaintiff, | § | |
| v. | § § | CASE NO. 3:16-CV-2916-S |
| HIGHLAND PARK INDEPENDENT SCHOOL DISTRICT, | § § § | |
| Defendant. | § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff R_____ S_____ ("RS" or "Plaintiff") is a secondary student with disabilities who attended school in Highland Park Independent School District ("HPISD" or the "District") from the spring of 2012 through the spring of 2015. While attending HPISD, Plaintiff received special education services from the District. Plaintiff, by and through his next friend, Ruth B., brought this civil action pursuant to the Individuals with Disabilities Education Act ("IDEA") to appeal and to obtain a reversal of the decision by the Special Education Hearing Officer ("SEHO") in the underlying special education due process hearing.

Plaintiff alleges that he suffered repeated injuries for years at HPISD, along with marked regression in skills, both academic and non-academic. Plaintiff's mother ultimately removed him from the District and enrolled him at Chase's Place, a small private school for children with disabilities. Plaintiff brought a due process complaint pursuant to IDEA against the District, requesting reimbursement for private school tuition and related expenses. After a three-day special education due process hearing, the SEHO denied the relief requested by Plaintiff. Plaintiff appeals the SEHO's decision to this Court, and also asserts claims pursuant to Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 701, *et seq.*, and pursuant to 42 U.S.C. § 1983.

The parties each filed Motions for Summary Judgment with respect to the IDEA claim. Plaintiff moves the Court to (1) reverse the decision of the SEHO, and (2) order HPISD to reimburse Plaintiff for prospective private placement and for private placement expense incurred since April 10, 2015. The District moves the Court to affirm the SEHO's decision rejecting all of Plaintiff's claims. For the reasons that follow, the Court grants the District's Motion [ECF No. 20], and denies Plaintiff's Motion [ECF No. 22].

## I. THE IDEA FRAMEWORK

This case arises under the IDEA. 20 U.S.C. §§ 1400-1482. The IDEA's purpose is to "ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living[.]" *Id.* § 1400(d)(1)(A).

The IDEA requires that a school district receiving federal funding: (1) provide a "free appropriate public education" ("FAPE") to each disabled child within its boundaries, and (2) ensure that such education is offered, to the greatest extent possible, in the "least restrictive environment" ("LRE") consistent with the student's needs. *Cypress-Fairbanks Indep. Sch. Dist. v. Michael F. ex rel. Barry F. ("Michael F")*, 118 F.3d 245, 247 (5th Cir. 1997); 20 U.S.C. § 1412(a)(1), (5). The FAPE provided must be developed to each disabled student's needs through an "individual educational program" ("IEP"). *Id.*; *see* 20 U.S.C. § 1414(d). An IEP is a "written statement prepared at a meeting attended by a qualified representative of the school district, a teacher, the child's parents or guardians, and, when appropriate, the child himself." *Michael F.*, 118 F.3d at 247; *see* 20 U.S.C. § 1401(20) The IEP is "the centerpiece of the statute's education delivery system for disabled children." *Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1 ("Endrew F.")*, 137 S. Ct. 988, 994 (2017) (quoting *Honig v. Doe*, 484 U.S. 305, 311 (1988)).

The IDEA requires that every IEP include "a statement of the child's present levels of academic achievement and functional performance," describe "how the child's disability affects the child's involvement and progress in the general education curriculum," and set out "measurable annual goals, including academic and functional goals," along with a "description of how the child's progress toward meeting" those goals will be gauged. *Id.* (quoting 20 U.S.C. §§ 1414(d)(1)(A)(i)(I)-(III)). The IEP must also describe the "special education and related services . . . that will be provided" so that the child may "advance appropriately toward attaining the annual goals" and, when possible, "be involved in and make progress in the general education curriculum." *Id.* (quoting 20 U.S.C. §§ 1414(d)(1)(A)(i)(IV)). An IEP must be "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Id.* at 999.

In Texas, the committee responsible for preparing an IEP is known as an Admissions, Review, and Dismissal committee ("ARDC"). *Michael F.*, 118 F.3d at 247. Parents and educators often agree about what a child's IEP should contain, but not always. *Endrew F.*, 137 S. Ct. at 994. When disagreement arises, parents may turn to dispute resolution procedures established by the IDEA. *Id.* The parties may resolve their differences through a "[p]reliminary meeting" or, somewhat more formally, through mediation. *Id.* (quoting 20 U.S.C. §§ 1415(e), (f)(1)(B)(i)). If these measures fail to produce accord, the parties may proceed to what the IDEA calls a "due process hearing" before a state or local educational agency. *Id.* (quoting 20 U.S.C. §§ 1415(f)(1)(A), (g)). The hearing is generally limited to the identification, evaluation, or educational placement of the child, or to determining whether the child received a FAPE. *Klein Indep. Sch. Dist. v. Hovem*, 690 F.3d 390, 395 (5th Cir. 2012). And at the conclusion of the

administrative process, the losing party may seek redress in state or federal court. *Endrew F.*, 137 S. Ct. at 994 (citing 20 U.S.C. § 1415(i)(2)(A)).

Under the IDEA, when a party aggrieved by an administrative decision brings a civil action, the district court may grant such relief as it determines is appropriate. *Richardson Indep. Sch. Dist. v. Michael Z.*, 580 F.3d 286, 292 (5th Cir. 2009) (quoting 20 U.S.C. § 1415(i)(2)(B)(iii)). Parents who remove their child from a public school setting because they believe that the public education program fails to provide a FAPE and who place their child in a private school for that reason are entitled to reimbursement if the court holds that (1) the proposed IEP did not provide a FAPE and (2) the private school placement was appropriate. *Hovem*, 690 F.3d at 396 (citing *Sch. Comm. of Burlington v. Dep't of Educ. of Mass.*, 471 U.S. 359, 369 (1985)).

## II. STANDARD OF REVIEW

The role of the judiciary under the IDEA is limited, leaving the choice of educational policies and methods in the hands of state and local officials. *White v. Ascension Par. Sch. Bd.*, 343 F.3d 373, 377 (5th Cir. 2003). When reviewing the decision of the SEHO from the due process hearing, the district court's review is "virtually *de novo*." *Dall. Indep. Sch. Dist. v. Woody*, 865 F.3d 303, 308-09 (5th Cir. 2017) (quoting *Michael F.*, 118 F.3d at 252). "When a district court reviews a hearing officer's decision under the IDEA program, it receives the records of the administrative proceedings and also takes additional evidence at the request of any party." *Hous. Indep. Sch. Dist. v. V.P. ex rel. Juan P. ("Juan P.")*, 582 F.3d 576, 582-83 (5th Cir. 2009). Although the district court is to give due weight to the SEHO's findings, the court must ultimately reach an independent decision based on a preponderance of the evidence. *Id.* at 583 (quoting *Michael F.*, 118 F.3d at 252). However, this "is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they

review." *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley ("Rowley")*, 458 U.S. 176, 206 (1982).

In an appeal under the IDEA, "summary judgment is not directed to discerning whether there are disputed issues of fact, but rather, whether the administrative record, together with any additional evidence, establishes that there has been compliance with IDEA's processes and that the child's educational needs have been appropriately addressed." *Seth B. ex rel. Donald B. v. Orleans Par. Sch. Bd.*, 810 F.3d 961, 967 (5th Cir. 2016) (internal quotation marks omitted). The IDEA creates a presumption in favor of the educational plan established by the IEP, and the party attacking the IEP bears the burden of demonstrating its inappropriateness. *Salley v. St. Tammany Par. Sch. Bd.*, 57 F.3d 458, 467 (5th Cir. 1995).

### III. BACKGROUND[1]

Per Special Order 3-318, this case was transferred from the docket of Judge Sidney A. Fitzwater to the docket of this Court on March 8, 2018.

The record in this case, which the Court has reviewed in determining whether to uphold or reverse the administrative decision below, is substantial. The parties participated in a three-day due process hearing on May 9-11, 2016. The SEHO heard the testimony of nine witnesses and the parties submitted nearly 5,000 pages of exhibits. The Court here aims only to present the contours of the relevant facts.

---

[1] As discussed below in § IV.A, Plaintiff's claims arising before April 13, 2014, are barred by the one-year statute of limitations. Any discussion by the Court of incidents occurring before April 13, 2014, are included only for context.

### A. R.S. and his Areas of Disability

R.S. resides in the geographical area served by HPISD. Admin. R. ("AR") 356.[2] At the time of the underlying due process hearing, R.S was 13 years old. *Id.* at 346. R.S. enrolled in the second grade in HPISD in January 2012, when R.S.'s mother, Ruth B., moved to Texas from Virginia. *Id.* at 2285, 5263. R.S.'s father, Commander ("Cdr.") S., lives in Virginia, but continues to be highly involved in R.S.'s care and decision-making, including his education. *Id.* at 2285. Both Ruth B. and Cdr. S. are attorneys. *See id.* at 5261, 5630-31.

R.S. is overwhelmingly described by those close to him as a happy, wonderful young man. His mother describes R.S. as a "sweet kid, fun-loving" with a "great sense of humor." *Id.* at 5261. According to Ruth B., R.S. is "always happy and optimistic." *Id.* Cdr. S. describes R.S. as a "fantastic young man" and "an engaging individual." *Id.* at 5632. His father describes him as "strong," "resilient," and "very clever" with a "defying spirit." *Id.* R.S. is described by his teachers and specialists as "inquisitive," "delightful," "a happy child," and a hard worker. *Id.* at 3306, 6260, 6325. At school, R.S. loves music and enjoys interacting with his friends and peers. *Id.* at 3307, 6332. Outside of school, R.S. also enjoys being outside, swimming, and attending professional sports games with his father. *Id.* at 3107.

R.S.'s medical conditions include hypotonia, Cortical Visual Impairment ("CVI"), cerebral palsy, and West Syndrome. *Id.* at 358, 381, 5262-6. At school, R.S. works with a large team of teachers, aides, and specialists. The specialist team working with R.S. includes a teacher of the visually impaired ("TVI"), an assistive technology ("AT") coordinator, a speech language

---

[2] Citations to the Administrative Record filed with the Court will denote the Bates-stamped page numbers provided by the Texas Education Agency ("TEA") in certifying the record (e.g., AR #), which are located in the bottom right hand side of each page, numbering 1 through 6489.

pathologist, an occupational therapist, a physical therapist, a special education teacher, a music therapist, and an adaptive physical education ("PE") teacher. *See id.* at 3123, 6351-52.

R.S. has significant visual impairment as a result of his CVI, which impacts many aspects of his education. *Id.* at 3118. According to Plaintiff's expert, Dr. Jan van Dijk, "With this condition, the eye structures are normal, but, because of brain damage, the child is unable to interpret incoming information from the eye." *Id.* at 1747. R.S.'s CVI requires him to use his other senses to support his visual sense. *Id.* at 1747, 3110. Scott Baltisberger, a specialist and consultant from the Texas School for the Blind and Visually Impaired ("TSBVI"), testified that because R.S. is "unable to access information visually, his hands are a very important source of information." *Id.* at 5755. Children with CVI take more time to access visual information, and will need sometimes more than an extra minute of time. *Id.* at 5765. According to the 2015 Functional Vision Evaluation and Learning Media Assessment Report, R.S. demonstrated a delay in time between the presentation of an object and the time it takes him to see it, particularly when materials and/or tasks are novel. *Id.* at 3111. R.S. also demonstrated a need for 30 to 45 seconds of "processing time" of closing his eyes before responding or interacting appropriately. *Id.*

R.S. is a nonverbal communicator. *Id.* at 384. R.S. communicates through vocalizations, body posturing, reaching, object symbols, photographs, and augmentative alternative communication ("AAC") devices, such as an iPad. *Id.* at 3126-27, 5854. During his time at HPISD, R.S. worked on communicating his wants and needs and understanding his daily tasks and schedule through an object-picture-symbol hierarchy. *Id.* at 6018-19. First, R.S. was given an object to hold and grasp. *See id.* Then, R.S. was given a picture of that object. *See id.* Ultimately, the picture would be transferred to a symbol for R.S. to select on his iPad. *See id.* For example, when it was time for R.S. to go to vision therapy with the TVI, Hillary Keys, R.S. would be

presented with keys. *Id.* at 6074. The goal was for R.S. to associate the keys with vision therapy, and "understand what activity he was about to do." *Id.* at 6074-75. R.S. would then progress through the hierarchy, and move from actual keys, to a picture of keys, to recognizing a symbol of keys on his AAC device as his understanding and familiarity with the symbol developed. *Id.* at 6078. Depending on R.S.'s familiarity with the symbol and what it represented, R.S. would be given either an object, picture, or symbol to communicate. *Id.* at 6019. New words and symbols were introduced at the beginning of the hierarchy, working up to use on the AAC device. *Id.* at 3126-27, 6019. According to the 2015 Full and Individual Evaluation ("FIE"), R.S. "has emerging skills in identifying his name, his school, some basic needs and choice using his communication device." *Id.* at 3126.

R.S. relies on equipment and staff support at all times throughout his school day to assist him with mobility, repositioning, toileting, feeding, and physical participation in various activities. *Id.* at 3140, 6166. R.S. requires assistance for safe participation in all physical activities. *Id.* at 3141. R.S. has low muscle tone throughout his body, and generally has more weakness in his trunk and proximal extremities. *Id.* at 3134. He does not have protective responses to prevent injury if he falls. *Id.* at 3141, 6168. R.S. is non-ambulatory and uses a wheelchair as his primary means for mobility. *Id.* at 3140. When not in his wheelchair, R.S. utilizes a variety of equipment. *Id.* at 3140, 6167. R.S. uses a standing frame for trunk and leg stretching in addition to lower extremity weight bearing. *Id.* at 2275. He also uses a gait trainer for daily mobility practice. *Id.* R.S. spends part of his day in the "Little Room," a piece of equipment that provides him with a safe environment for independent play and sensory-based exploration. *Id.* at 3140. In some classes, R.S. does his work sitting in a supportive chair with his feet flat and a seat belt. *Id.* He also utilizes a posture bench called a Kaye bench to work on his postural control. *Id.* at 6175. R.S.

wears orthotics on both feet to manage foot position and to allow him to stand safely. *Id.* at 3146, 6257. According to the 2015 FIE, R.S. has made progress in his ability to assist staff with his transitions from equipment to equipment throughout the school day. *Id.* at 3143.

### B. Spring 2012

After moving from Virginia to Texas with his mother, R.S. enrolled in HPISD in January 2012 as a second grader at Hyer Elementary School ("HES"). AR 2273, 2285, 2331, 6263. The principal of HES at the time was Jeremy Gilbert. *Id.* at 6080-81. HPISD provided special education services to R.S. upon his enrollment in the District based upon his IEP developed in Virginia. *Id.* at 690-730, 6083-84, 6163-64. On May 11, 2012, the District completed R.S.'s FIE in all areas of suspected disability, and confirmed R.S. met eligibility requirements for special education and related services as a student with an intellectual disability, visual impairment, speech impairment, orthopedic impairment, other health impairment (epilepsy), and multiple disabilities. *Id.* at 2273, 2288. R.S. subsequently qualified for special education and related services on the basis of these disabilities. *Id.* at 2329.

In early 2012, Plaintiff's parents assert that R.S. was sent home with dried feces on his wheelchair after he experienced a significant accident at school. Pl.'s Mot. 3-4. The evidence in the record, however, supports the SEHO's finding that HES staff notified R.S.'s mother and asked if she wanted to pick up R.S. from school after the accident, cleaned R.S., had him seen by the school nurse, gave R.S. a fresh change of clothing, cleaned his wheelchair as best as possible, and kept R.S. out of his wheelchair for the remainder of the day. *See* AR 6085-87.

### C. 2012-13 School Year

Beginning in October 2012, R.S. experienced a series of injuries and falls during his time enrolled in the District. On October 3, 2012, R.S. fell forward off the Kaye bench and hit his face

on the floor, causing a swollen area directly below his left eye. AR 4428. At the time of the fall, R.S. was working with his occupational therapist. *Id.* at 6089, 6177-78. After R.S. fell from the Kaye bench, the District implemented a protocol that required an aide or teacher to also be present whenever R.S. was working with a specialist. *Id.* at 6106, 6128.

Plaintiff alleges that he regressed significantly in his skill levels during the 2012-13 school year. Pl.'s Mot. 6. The District did concede during an October 2013 ARDC meeting that there had been regression during the 2012-13 school year in the area of communication AT. AR 2427, 6029, 6096-97. HPISD chiefly attributed this documented regression to human error by the special education teacher in the course of data collection. *Id.* at 1144, 6029. However, HPISD also admitted that some of this regression constituted actual regression in R.S.'s skill levels. *Id.*

In January 2013, Ruth B. notified HPISD that R.S. was developing a pressure sore on his tailbone. *Id.* at 1406. On January 30, 2013, Dr. Tana Roberts, R.S.'s pediatrician and primary care provider, notified the District that R.S.'s pressure sore was in the earliest stage (stage 1) and was likely developing as a result of prolonged sitting and wheelchair use. *Id.* at 1415. In response to both Ruth B. and Dr. Roberts's concerns, the District contacted R.S.'s wheelchair vendor to conduct pressure mapping on R.S.'s equipment, and implemented a 30-to-45 minute repositioning protocol to alleviate R.S.'s pressure sore. *Id.* at 6180-86.

### D. 2013-14 School Year

On October 11, 2013, R.S.'s 2013 ARDC convened to review his progress and to review and revise his IEP. AR 2426. Prior to the ARDC meeting, the District obtained input from R.S.'s private therapists on IEP goals and objectives, and held numerous collaborative meetings with R.S.'s parents to draft and revise R.S.'s proposed goals and objectives. *Id.* at 2426, 2429, 3308-09, 3973. Cdr. S. attended the meeting in person, and Ruth B. attended by phone. *Id.* at 2426.

During the meeting, Cdr. S. stressed the importance of accurate data collection and his wish that expectations for R.S. not be lowered. *Id.* At this meeting, HPISD conceded that there had been regression during the previous school year in the area of communication AT. *Id.* at 2427, 6029, 6096-97. The data presented at the October 2013 ARDC meeting indicated that R.S.'s progress varied greatly from one grading period to another. *Id.* at 2428.

At the continuation of the ARDC meeting on October 22, 2013, the ARDC discussed compensatory services available to address R.S.'s regression. *Id.* at 2433. Ruth B. attended in person and Cdr. S. attended by phone. *Id.* One of the compensatory services requested by R.S.'s parents was a District referral to TSBVI. *Id.* The ARDC discussed the disadvantage of TSBVI being the "most restrictive environment away from typically developing peers and family members." *Id.* at 2434. The ARDC agreed to table the discussion on TSBVI until a later ARDC meeting. *Id.*

While Ruth B. was on campus for the ARDC meeting on October 22, R.S. suffered a second injury to his head and face. R.S. was working in his standing frame with the AT coordinator and an aide when he fell forward and struck his face on an iPad that was being held in front of him. *Id.* at 4423-24, 6129-30. Principal Gilbert testified that when he became aware of the incident, he pulled Ruth B. out of the ARDC meeting to check on R.S. *Id.* at 6098-99. Principal Gilbert and Ruth B. decided that R.S. was okay to return to class. *Id.* at 6099. The nurse noted minimal bruising soon after the incident. *Id.* at 4424. However, the AT coordinator testified, and photographs taken by Ruth B. demonstrate, that the affected area became very red and swollen the next day. *Id.* at 2218-25, 5876-77. Following the iPad incident, the AT coordinator purchased a new foam case and stand for the iPad. *Id.* at 5877. The District also implemented a new protocol requiring someone to be within arm's length of R.S. at all times. *Id.* at 6106.

On October 31, 2013, the ARDC reconvened for the third time after Ruth B. expressed disagreement with R.S.'s proposed placement and compensatory services, and Cdr. S. expressed disagreement with how the ARDC meeting minutes were worded. *Id.* at 2453. Ruth B. attended in person, and Cdr. S. participated by phone. *Id.* Kendra Reece, an advocate from Disability Rights Texas, also participated in the ARDC meeting. *Id.* At the reconvene, the District acknowledged that it did have "less than reliable data which indicates regression," and agreed to make a referral to TSBVI as a compensatory service. *Id.* at 2454-55. The District also agreed to make an application for the TSBVI Outreach Program. *Id.* at 2454. When Ruth B. expressed a concern regarding the injuries that had occurred at school, the ARDC discussed taking antecedent/behavior/consequence ("ABC") data, requesting a functional behavior assessment ("FBA"), and developing a behavior intervention plan ("BIP") for R.S. if needed. *Id.* at 2455. The ARDC meeting ultimately ended in agreement by all parties. *Id.* at 2457.

On November 22, 2013, the ARDC met again to consider an FBA and BIP based on behaviors seen at home and at school. *Id.* at 2481. Ruth B. attended in person, and Cdr. S. participated by phone. *Id.* Ruth B. expressed that her behavioral concerns arose after the injury at school when R.S. hit his head on the iPad. *Id.* The specific behaviors discussed included R.S. shutting down, refusing to work by putting his head down or pretending to be asleep, putting his hands in his mouth, batting his ears, and refusing to keep his glasses on. *Id.* Ruth B. signed the consent for the FBA and BIP, as well as a consent for psychological services. *Id.*

While Ruth B. was on campus for the November ARDC meeting, R.S. suffered yet another injury. R.S. rolled off a cot used as a changing table for him when his aide stepped away to look for a trash can. *Id.* at 4421, 6101-03, 6394. The nurse noted an abrasion to R.S.'s forehead with no bleeding or swelling, and R.S. returned to class. *Id.* at 4421. Photographs taken by Ruth B.

demonstrate that R.S. later developed a black eye and bruised face. *Id*. at 2226-27, 2230. In response to the injury, Principal Gilbert met with R.S.'s parents the next Monday. *Id*. at 4475, 6104. Principal Gilbert assured R.S.'s parents that he would investigate and take the safety steps requested. *Id*. at 6104, 6106-07. The District instituted a new hygiene protocol and added a safety belt to the changing table. *Id*. at 4475-76, 6106-09.

On February 28, 2014, the ARDC met to review R.S.'s FBA and BIP. *Id*. at 2578. Cdr. S. attended in person. *Id*. The ARDC agreed to conduct an orientation and mobility ("O&M") evaluation. *Id*. The ARDC also discussed the response from TSBVI regarding R.S.'s referral. *Id*. TSBVI did not accept R.S. for admission, stating that its "review of [R.S.'s] educational records and other information led us to conclude that he is currently receiving a [FAPE] from your district and will continue to have meaningful instructional opportunities within your district and community." *Id*. at 2491. However, TSBVI did agree to provide support to the District through its Outreach Program. *Id*. at 2491, 2578. The ARDC meeting ended in agreement. *Id*. at 2580-83.

TSBVI conducted its initial visit to the District on April 14 and 15, 2015. *Id*. at 2595-2619. During the initial visit, Baltisberger, TSBVI's Specialist in Education of the Visually Impaired, observed R.S. in his classrooms throughout the school day, consulted with his teachers, met with R.S.'s parents in his home, and conducted a closing meeting. *Id*. at 2596, 5754-55. Baltisberger observed during his initial visit that R.S.'s "schedule was very busy," and felt that the "pacing should be slowed down a little bit." *Id*. at 5757. Baltisberger also noted that R.S. had "a lot of goals and objectives, and it seemed that a lot of time was being spent taking data." *Id*. During his testimony, Baltisberger explained that children with CVI learn by first using their hands to explore their environment. *Id*. at 5757-60. Baltisberger analogized the special needs of students who are

severely visually impaired and also have additional impairments to the development of very young children. *Id.* at 5758. Baltisberger explained,

> [I]nformation is acquired sequentially. . . . A child who . . . has vision, they learn to coordinate their hand movements with their environment. . . . [A] child is not born understanding that they have [an] impact on their environment. They don't understand . . . they are moving their own hands, and they are picking things up and moving them. They learn that by visually observing that environment. And that skill, the whole skill of reaching out and picking something up leads to other things, leads to manipulating objects, leads to explor[ing] the objects, leads them to understand[ing] the different properties of the object, leads to understanding that this has a name that it's called. So all these things have to occur before the other information really starts to make a lot of sense.
>
> ...
>
> [I]f you want a child to learn about dairy farming, . . . they need to understand that there is a thing – a cow. . . . [B]efore that, they have to understand that there are things that [are] known as animals. And before that, they have to understand that there are things out in the environment. And before that, they have to understand that they can interact with that environment.

*Id.* at 5759-60. Because R.S. was not "physically interacting with his environment to a great degree," Baltisberger was concerned that many of R.S.'s academic goals and skills "wouldn't make sense to him" and "would not be the most useful way for him to spend his time." *Id.* at 5760.

At the end of his initial visit, Baltisberger made suggestions to address his two main areas of concern for R.S.: (1) mobility and (2) independent, active engagement with the environment. *Id.* at 2597. To aid in R.S.'s mobility, Baltisberger suggested, among other things, "[i]ncorporat[ing] movement and travel into activities and routines rather than presenting mobility as a separate activity by itself." *Id.* To help R.S. develop greater independence, Baltisberger made numerous suggestions. Baltisberger recommended the use of Active Learning with R.S., which is the approach developed by Plaintiff's expert, Dr. van Dijk. *Id.* at 2596-97, 5468-69, 5755-57. Active Learning was designed specifically for children with visual impairment to address their needs in acquisition of foundational concepts. *Id.* at 3089. Baltisberger also recommended that

District staff utilize hand-under-hand instruction, slow the pace of instruction to allow R.S. more time to process information, and develop consistent routines. *Id.* at 2597-99. Because R.S. at that time was not interacting with his physical environment to a great degree, Baltisberger emphasized a greater focus on functional skills rather than grade-level academic concepts. *Id.* at 2699, 5758-60. Finally, Baltisberger suggested that R.S.'s communication system should be infused throughout the day, and underscored that whenever a new symbol is introduced, an object symbol should be used first. *Id.* at 2600.

Baltisberger testified that the District was willing to implement his recommendations, and had actually already begun to implement many of his suggestions under the recommendations of the TVI. *Id.* at 5767. Plaintiff's parents, however, were initially concerned by his recommendations. *Id.* at 5760-61. Baltisberger testified that R.S.'s parents were advocating and pushing for R.S. to engage in the academic activities Baltisberger expressed concern with, and wanted to keep many of his academic goals in place. *Id.* Plaintiff's parents were worried that a focus on Active Learning activities "represented things that [R.S] had already accomplished earlier." *Id.* However, after meeting with Plaintiff's parents and explaining his recommendations, they ultimately agreed. *Id.* At the end of his visit, Baltisberger worked with the District to develop an action plan, and agreed to return to HPISD for further consultations, particularly as R.S. transitioned from HES to middle school. *Id.* at 2602-04, 5768-69. Baltisberger testified that he had no concerns regarding the TVI's understanding of his recommendations. *Id.* at 5769-70.

On May 9, 2014, the ARDC met again to review the O&M evaluation and to consider the report from TSBVI. *Id.* at 2764. Both Ruth B. and Cdr. S. attended in person. *Id.* Based on the results of the O&M evaluation, R.S. qualified for O&M services. *Id.* The report from TSBVI was sent to Ruth B. and Cdr. S. before the ARDC meeting, and the recommendations from TSBVI

were considered when drafting new goals and accommodations for R.S.  *Id.*  The proposed goals were sent to R.S.'s parents before the meeting, and there was a collaboration meeting with R.S.'s parents the week before to review the proposed goals, along with email communication.  *Id.*  Ruth B. shared at the meeting that R.S. was "improving in all areas" and that he is "happy when he is at school."  *Id.*  The meeting ended in agreement.  *Id.* at 2766.

### E. Summer 2014 (Extended School Year)

On June 24, 2014, while R.S. was attending a different elementary school for Extended School Year ("ESY") services, he fell off the Kaye bench onto the floor.  AR 4455-56, 5315.  At the time of the fall, R.S. was working with the TVI and an aide.  *Id.* at 5315.  The school nurse noted a small abrasion on his upper lip.  *Id.*  However, photographs taken later by Ruth B. demonstrate that R.S. had a black eye and significant bruising and swelling around and above his left eye.  *Id.* at 2232-41, 5316.

Ruth B. testified that HPISD did not notify her directly of the injury.  *Id.* at 5317-18.  Rather, Ruth B. learned about the fall from a private care provider she hired to work with the family that summer.  *Id.* at 5317-18.  Ruth B. met with Dr. Catherine Donahue, the District's Director of Summer Programs, on June 26, 2014, to discuss the fall.  *Id.* at 1498-99, 5321.  After the meeting, Ruth B. emailed Dr. Donahue with her concerns regarding "inconsistencies" with the nurse's report, the report from the vision teacher, and Dr. Donahue's report regarding the incident.  *Id.* at 1498-99.  Ruth B. also expressed her concern that the June 24, 2014, fall was the fourth head injury R.S. had suffered while attending school in HPISD.  *Id.*

On June 27, 2014, Ruth B. filed a neglectful supervision report with Child Protective Services ("CPS").  *Id.* at 1502-12.  Ruth B. testified that she filed the CPS report because she "could not get a straight answer out of the school" and she was concerned that there might be other

incidents that she did not know about. *Id.* at 5323-24. CPS made written findings that R.S.'s "safety is threatened due to inadequate supervision" and that R.S. had "bruising to a vital body part from falling." *Id.* at 1512.

In response to the incident, HPISD staff members assured R.S.'s parents that they were addressing the issues and would take whatever measures necessary to prevent any further injuries as R.S. transitioned to middle school. *Id.* at 1521-23, 5324-26. April Estrada, the Director of Special Programs for the District, indicated that she would review R.S.'s current plan and make any necessary changes to ensure his safety, and would also work with Debbie Morrison, the Special Education Coordinator at the middle school. *Id.* at 1598, 6378-81.

### F. 2014-15 School Year

R.S. transitioned to McCulloch Middle School ("MIS") for the 2014-15 school year. Prior to the start of the new school year, the District held trainings for staff working with R.S. on safety procedures, including proper transfer techniques. *See id.* at 3318, 3975, 3977, 4457, 6211-16. Plaintiff alleges that Ruth B. witnessed MIS staff using a "prisoner hold" on R.S. during the August training session she attended. Pl.'s Mot. 19. However, the evidence in the record supports the SEHO's finding that the term "prisoner hold" was never used by the District, and that R.S.'s transfers were appropriately accomplished. AR 6219-23. Moreover, after Ruth B. expressed concerns regarding the transfer technique, the District discontinued use of that particular transfer technique and also set up a meeting in the home with R.S.'s private therapist to discuss transfer techniques. *Id.* at 6218-19, 6224-25.

On September 30, 2014, R.S. suffered his fifth injury at an HPISD school when he fell forward while seated in his "office chair" wearing his safety belt. *Id.* at 6234-36. At home, R.S. had been using a rolling, adjustable height office chair with a seatbelt and a Boppy cushion behind

his back. *Id.* at 6226-27. The wheels on the chair did not have locks. *Id.* at 6227. Lydia Boudreaux, the District physical therapist, testified that after visiting R.S. at home and meeting with his private therapists, she found a similar chair for R.S. to use during his classes because R.S. was demonstrating "nice posture" when using the chair. *Id.* On the date of the injury, despite using a safety belt, R.S. somehow tilted the chair forward until his forehead hit the floor, causing an abrasion. *Id.* at 4409, 6235-36. Following the incident, the nurse noted that R.S. had a red, oval abrasion on his forehead just above his eyebrow. *Id.* at 4409. R.S. returned to class for the remainder of the day. *Id.*

On October 3, 2014, the ARDC met for its annual meeting. *Id.* at 2956. Both Ruth B. and Cdr. S. attended the meeting. *Id.* at 2967. R.S.'s parents shared their concerns regarding the injury on September 30, 2014. *Id.* at 2956. Plaintiff alleges that at the meeting, Boudreaux "became frustrated and suggested that the only way to prevent R.S. from falling and suffering injury was to restrain and immobilize him completely and that she could provide equipment for this purpose." Pl.'s Mot. 15. Boudreaux testified that she did make the statement out of frustration because the District and the family "had worked so hard together to try to work on [R.S.] getting more independent with his sitting, working on transfers." AR 6240. Boudreaux testified that there was no way to assure that R.S. would never have any kind of incident. *Id.* According to Boudreaux, "[I]n an effort for [R.S.] to work on his postural control and for him to move and be moving in his school environment, he is at risk just like any child. When you're learning a skill, you are at risk to have an incident." *Id.* at 6290.

In response to the injury, the ARDC discussed conducting additional staff trainings every three weeks. *Id.* at 2956. Ultimately, MIS staff received additional training on November 11, 2014, November 14, 2014, November 20, 2014, December 4, 2014, December 11, 2014, December

12, 2014, December 18, 2014, January 21, 2015, February 5, 2015, February 10, 2015, February 13, 2015, February 18, 2015, and April 17, 2015. *Id.* at 3395-3412. Training topics included: safety plan review, toileting routine, wheelchair to chair transfer, TSBVI follow up, transfers generally, gait trainer, orthotics and stander, "Little Room," safety, and standing routine. *Id.* Additionally, the District implemented a new safety protocol requiring two people to be with R.S. whenever he was using equipment other than his wheelchair. *Id.* at 6236-37. The ARDC also agreed to one primary aide working with R.S. in the morning, and a different one in the afternoon to avoid any fatigue. *Id.* at 2957.

The ARDC discussed R.S.'s progress and goals, including in music therapy, O&M, physical therapy, adaptive PE, and toileting. *Id.* Due to time constraints, the meeting was reconvened on October 24, 2014. *Id.* at 2958. Prior to the reconvene, Ruth B. and Cdr. S. received a copy of R.S.'s present levels of academic achievement and functional performance ("PLAAFP"). *Id.* At the reconvene, the ARDC again discussed R.S.'s progress and goals. *Id.* at 2958-61. R.S.'s parents asked numerous questions and made suggestions for changes, and the District staff answered the questions and made changes to R.S.'s IEP based on parental input. *Id.* The ARDC agreed to recess and reconvene on November 10, 2015. *Id.* at 2961.

In the interim, Amanda Rutherford, the District's AT coordinator, met with Ruth B. and/or one of R.S.'s caretakers on October 28, 2014, and November 3, 2014, to compare the images used for R.S.'s communication devices at home and at school. *Id.* at 2976. At the reconvene on October 24, 2014, Ruth B. had expressed her concern that there were inconsistencies between the images R.S. used to communicate at home and at school. *Id.* at 2959. Rutherford testified that she collaborated with Ruth B. and R.S.'s caretakers on numerous occasions after R.S. enrolled in the

District to ensure consistency between R.S.'s AAC device at home and at school, including over the weekend, *Id*. at 5857-58, 5906.

Both Ruth B. and Cdr. S. attended the November 10, 2014, reconvene. At the reconvene, Plaintiff's parents raised numerous concerns about R.S.'s goals and progress. *Id*. at 2961-63. Ruth B. expressed her concern that R.S. using a hard copy picture as opposed to the iPad would be a step back. *Id*. at 2961. Cdr. S. observed R.S. in his classroom before the reconvene, and was concerned that he did not see the communication device utilized as recommended by TSBVI, including allowing enough wait time to respond. *Id*. Both parents were concerned that data was not being collected accurately on goals and R.S.'s IEP was not being implemented consistently. *Id*. District staff addressed Plaintiff's parents' concerns, and answered their questions. *Id*. at 2961-63. The ARDC continued to discuss R.S.'s progress and goals and make changes to R.S.'s IEP based on parental input. *Id*. Ultimately, the ARDC agreed to table the meeting, and reconvene again at a later date. *Id*. at 2963. Due to a death in R.S.'s family, the ARDC did not reconvene as planned on November 14, 2014. *Id*. at 2992. However, the members of the ARDC agreed to implement the goals and objectives already discussed and agreed upon. *Id*. at 2996.

TSBVI returned to consult with HPISD on December 4 and 5, 2014. *Id*. at 3032-40. Baltisberger testified that he observed HPISD staff using some of the Active Learning techniques that he had previously recommended. *Id*. at 5773-74, 5830. Baltisberger also testified that he did not see anything in his observations that he felt to be inappropriate and that the District was willing and able to implement his recommendations. *Id*. at 5775. Baltisberger's primary concern after his second visit was an overreliance on pictures in the object-picture-symbol hierarchy. *Id*. at 5771-72. Baltisberger observed that R.S. had difficulty with the picture symbols and recommended utilizing objects instead. *Id*. R.S.'s parents were reluctant to use objects in place of pictures

because they were concerned this might represent a regression. *Id.* at 5775. After meeting with Baltisberger, the District and R.S.'s parents ultimately agreed to use objects for words and activities R.S. was less familiar with, and use pictures for words and activities R.S. was consistently responding to. *Id.* at 5772-75.

On December 12, 2014, the ARDC reconvened to review the remaining proposed goals and objectives following parental input. *Id.* at 2964-66. Ruth B. attended in person and Cdr. S. joined by phone. *Id.* at 2964. The ARDC, including R.S.'s parents, agreed that the goals for R.S. to reach were appropriate, but there still needed to be clarity on implementation of the goals. *Id.* at 2965. The ARDC agreed that how best to implement goals would be supported through on-going consultation with TSBVI. *Id.* Ultimately, Plaintiff's parents did not agree to the full IEP as written. *Id.* at 2966. District staff believed that current services were successful and that on-going consultation with TSBVI was needed. *Id.* Plaintiff's parents, however, did not agree that provided services were successful, and asked to provide a written statement of their disagreement to be added to the ARDC document. *Id.* Since a consensus was not reached, the District offered a 10-day recess to collect information to address points of disagreement. *Id.* Plaintiff's parents declined the recess option. *Id.*

On December 31, 2014, R.S.'s parents submitted a statement to append the ARDC meeting documentation. *Id.* at 687-89. R.S.'s parents expressed concern about R.S.'s IEP implementation, specifically the TSBVI recommendations, training of staff, and basic safety at school. *Id.* at 687. The letter alleged that during a November 7, 2014, visit by Cdr. S., recommendations from TSBVI were not being followed by the District, but did not specify what aspect of the IEP or TSBVI recommendations were not being followed. *Id.* at 687-88. The letter also alleged that R.S. had yet to have an AT system developed and consistently employed. *Id.* at 689. Plaintiff's parents also

renewed their request for a third party to assist with IEP development and training, stating in the letter that TSBVI was inadequate in this function. *Id.* at 688.

On January 21, 2015, Baltisberger returned to the District for a third visit, accompanied by an O&M specialist from the TSBVI Outreach program. *Id.* at 5775-76. Baltisberger testified that he did not have any concerns regarding the District's implementation of his prior recommendations, and that he found the District's staff was open to his suggestions. *Id.* at 5780-81. Baltisberger's primary recommendation was to reduce the number of goals in R.S.'s IEP. *Id.* at 5778-79. Baltisberger also testified that R.S.'s communication system was an area of concern and disagreement between R.S.'s parents and the District. *Id.* at 5781-82. According to Baltisberger, R.S. "at that point was using a lot of different things in a lot of different places." *Id.* at 5783. Baltisberger recommended, and the District and parents agreed, to adopt a single system that could be implemented at home and at school across all environments. *Id.* at 5782-83.

TSBVI conducted its fourth and final visit to the District on March 24-25, 2015. *Id.* at 3086-3104. On his final visit, Baltisberger brought another specialist from the TSBVI Outreach Program who works with students who have CVI and multiple impairments. *Id.* at 5784. Baltisberger testified that the District "really seemed to be hitting their stride more with the [A]ctive [L]earning activities." *Id.* at 5785. Baltisberger observed R.S. doing co-active activities with his teaching assistants that Baltisberger described as a "really, really nice lesson." *Id.* at 5786-88. He also observed R.S. in a "neat" cooking lesson that was motivating and functional. *Id.* at 5788. Baltisberger testified that he observed R.S. in his classes "using his tactile and his vision to access materials." *Id.* For example, in math class, Baltisberger observed R.S. not "just doing . . . math," but doing "hands-on activities, exploration activities" as well. *Id.* at 5789. The report from

TSBVI concluded that R.S. had begun independently using his hands to a greater degree. *Id.* at 3089. The report also noted R.S.'s success with current Active Learning strategies. *Id.*

Throughout the 2014-15 school year, Plaintiff's parents raised numerous concerns regarding R.S.'s toileting procedure, transfer techniques, and equipment. Plaintiff alleges that Ruth B. again witnessed District staff using an improper "prisoner hold" during a training in December. Pl.'s Mot. 20. Plaintiff also alleges that the District continued to use equipment that R.S. had outgrown despite his discomfort. *Id.* Moreover, Plaintiff alleges that Ruth B. witnessed HPISD staff sitting R.S. on the toilet backwards "and allowing him to fall in while he was struggling and crying." *Id.* Finally, Plaintiff alleges that the District continued to put R.S.'s orthotics on the wrong feet. *Id.* at 22. However, the Court finds that the record supports the SEHO's findings that (1) R.S.'s wheelchair transfers were appropriately accomplished; (2) the District worked closely with Ruth B. to devise a toilet training protocol, which included trials sitting backwards on the toilet, but R.S. never fell in the toilet; and (3) that R.S. was sent home in discomfort with his orthotics on the wrong feet one day, but R.S. did not suffer any injury as a result of his orthotics being mistakenly placed on the wrong feet. *See* AR 15-17; *see also id.* at 6199-6203, 6219-23, 6249-50. Additionally, both R.S.'s physical therapist and adaptive PE teacher testified that they did not have any concerns about R.S. outgrowing his equipment. *Id.* at 6231, 6367.

Plaintiff filed a request for a due process hearing with the TEA on April 13, 2015. *Id.* at 50-68. On May 11, 2015, the District completed R.S.'s 2015 FIE. *Id.* at 3123-79. The ARDC met on May 15, 2015, to review the 2015 FIE, as well as to review and revise R.S.'s IEP. *Id.* at 3259. Prior to the ARDC meeting, Plaintiff's parents each received a copy of the FIE, the draft IEP, updated goals and objectives, and proposed goals and objectives based on R.S.'s PLAAFP.

*Id.* at 3218-3222, 3259, 4706-07. The ARDC met and reconvened three different times—May 15, May 18, and May 22. *Id.* at 3253-56. Cdr. S. participated in all three, but Ruth B. did not attend. *Id.* The ARDC reviewed R.S.'s progress and goals, addressed Cdr. S.'s questions and concerns, and revised R.S.'S IEP based on feedback and suggestions from Cdr. S. *Id.* at 3259-3271. Cdr. S. was concerned that some of R.S.'s goals were not challenging enough, particularly with regard to his communication and AAC device. *Id.* at 3260, 3264, 3271. Ultimately, the ARDC reached consensus, and Cdr. S. stated that all of his concerns were discussed and that he appreciated the effort of the District to consider his concerns and make adjustments to the IEP. *Id.* at 3271.

### G. Removal from HPISD

R.S. did not return to HPISD for the 2015-16 school year. AR 4719. Ruth B. removed R.S. from HPISD, giving HPISD notice of his removal on August 24, 2015. *Id.* R.S. enrolled in Chase's Place, a very small private school with only 10 children in attendance. *Id.* at 5358-59, 5559. Plaintiff alleges that he has made progress at Chase's Place on many fronts. Pl.'s Mot. 30. However, because Chase's Place lacks the funds and staffing to supply all of the therapies and services R.S. needs, Ruth B. is supplementing with outside therapists and service providers. AR 5360. Ruth B. paid $71,395.99 for both Chase's Place and for R.S.'s supplementary private services. *Id.* at 1769-75, 2040-42, 2125-36, 2137-45, 2191-2213.

### H. R.S.'s Progress and Regression

The parties greatly dispute R.S.'s progress and regression during his time enrolled in the District. Plaintiff alleges that he regressed severely in numerous areas, including his communication skills, vision, mobility, and other skills. Pl.'s Mot. 25-29. Additionally, Plaintiff argues that the SEHO made "an erroneous evaluation of the evidence" regarding R.S.'s regression, and describes his analysis as "flawed." *See id.* at 28 n.16. In contrast, the District maintains that

R.S. made significant academic and non-academic progress since his enrollment in the District. *See* Def.'s Mot. 28-35.

## *(1) Communication*

Plaintiff alleges that he regressed with respect to communication. According to Plaintiff, he came to HPISD with a Dynavox communication system, a calendar system, and a picture exchange system. AR 5347-49. Plaintiff claims that HPISD did not use these systems with him, such that he lost his means of communication. Pl.'s Mot. 25. The Court, however, finds that the evidence in the record does not support Plaintiff's argument.

R.S.'s records from his school district in Virginia reflect that, as of May 5, 2011, R.S. demonstrated inconsistent progress in development of receptive language and negligible progress in development of speech. AR 691. R.S.'s IEP Progress Reports indicate that after three six-week grading periods, R.S. had not yet demonstrated progress on eight out of nine communication-related IEP objectives, including using an unspecified AAC device to communicate needs, making a choice between two options, greeting peers and teachers, identifying 20 new items per quarter, and sorting items by three categories. *Id.* at 701-03. R.S.'s IEP Progress Report from April 1, 2011, indicates that R.S. was inconsistent with using his AAC device to communicate his needs, R.S. was inconsistent with the AAC device in making a choice between two options, and that "[i]nconsistency has made it impossible to determine what [R.S.] means" when using an AAC device to communicate basic needs and wants and to increase his social interaction. *Id.* at 702. R.S.'s IEP Progress Report from June 21, 2011, states, "[R.S.] still tends to scroll through choices on his device rather than choosing one. When he uses the large pictures he is very successful." *Id.*

On his IEP from November 15, 2011, R.S.'s present level of performance in communication states:

> Strengths: [R.S.] has made great progress in using 4" x 4" pictures to identify the objects and reinforcers he desires. He is able to do so in a scattered array and the pictures can even be moved to different locations. At this time, he uses them to choose from break items and reinforcers. [R.S.] has also been using his AAC device to greet his peers but still requires hand over hand adult support to be successful.
>
> Needs: [R.S.] needs to expand his communication by using pictures to request items he needs, such as water, food, bathroom, and other items. He would also benefit from using a device to greet his peers and teachers. The team would like to decrease the size of pictures over time in hopes that one day he can transfer the skill to an augmentative communication device.

*Id.* at 713.

Upon enrolling in HPISD, the District purchased an iPad for R.S. to use as his AAC device. *Id.* at 5910. The AT coordinator testified that the District decided to use an iPad instead of a Dynavox as R.S.'s AAC device because R.S. had already been using an iPad at home as his personal communication device for multiple years. *Id.* at 5910-11. As discussed above, the District conceded in October 2013 that R.S. suffered from some regression in the area of AT communication during his first year enrolled in the District. *See id.* at 2427, 6029, 6096-97. However, R.S.'s 2015 FIE indicates that R.S. did make progress in communication while enrolled in HPISD. R.S.'s 2015 FIE indicates that not only did R.S. use an AAC device to answer yes and no questions, such as, "Do you want your glasses off?", but he was also able to identify his name, school, and some basic needs and items, as well as make choices. *Id.* at 3126. Significantly, while R.S. required adult support to utilize his AAC in November 2011, by May 2015, R.S. was "able to activate a cell on the device using his index and third finger paired together." *Id.*

*(2) Vision*

Plaintiff also alleges that he regressed with respect to vision. According to Plaintiff, by the time R.S. reached the end of his time at HPISD, he was back squarely within Phase II of CVI resolution even though he had demonstrated "signs of Phase III partial resolution" while in Virginia. Pl.'s Mot. 26. The Court, however, finds there is no support in the record for Plaintiff's allegation that R.S. regressed in his vision and declined on the CVI Chart range.

R.S.'s November 2011 IEP from Virginia indicates that R.S. "made great progress using 4" x 4" pictures to identify the objects and reinforcers he desires," and includes a goal to decrease picture size from 4" to 3". AR 713. There is no evidence in the record that R.S. had previously had success with using 3" x 3" pictures while in Virginia. R.S.'s 2012 FIE states that R.S. is "working on communicating using real pictures that are 3x3 to 4x4 inches," that R.S.'s "expressive communication goals included using 4 x 4going down to 3x3 pictures to request his wants and needs," and that R.S. "has been trying to use 3x3-4x4 pictures." *Id.* at 2280-81, 2284. Plaintiff has not directed the Court to any evidence in the record demonstrated that R.S. ever exhibited success with 3" x 3" inch pictures.

Furthermore, R.S.'s Function Vision/Learning Media Assessment from Virginia indicates that R.S. has CVI, but does not indicate a CVI Chart range. *See id.* at 693-95. Plaintiff relies heavily on his lack of color and pattern preference, as well as his typical visual/social response, to establish that R.S. was in CVI Phase III as of May 2011, but there are many other factors that indicate that R.S. was actually in CVI Phase I and/or CVI Phase II at that time. *See id.* at 694-95, 3364-67. As of October 2013, R.S. had a CVI Chart range of 5.75-8, indicating that he was in Phase II. *Id.* at 2332. The TSBVI Outreach Program Consultation Report from March 2015 also placed R.S. in Phase II. *Id.* at 3087. The May 2015 Functional Vision Evaluation and Learning

Media Assessment notes a CVI Chart range of 6.25-8, also placing R.S. in Phase II. *Id.* at 3110. Plaintiff cannot establish that R.S. regressed with respect to his CVI phase while enrolled in HPISD.

### (3) Mobility

Plaintiff alleges that he regressed with respect to his mobility. Plaintiff relies heavily on data regarding his ability to move in his gait trainer in support of this position. In Virginia, R.S. could move in his gait trainer 100 to 150 feet in good time with few reinforcers. AR 717. In October 2014, R.S. was able to "move forward with assistance to steer only for 50-150 feet consistently with visual and verbal prompting." *Id.* at 2638. While this data does not clearly indicate significant progress, overall, the evidence in the record demonstrates that R.S. made progress in several areas related to his mobility.

R.S.'s June 21, 2011, IEP Progress Report from Virginia indicates that R.S. made "sufficient" progress on his IEP goal of sitting in a classroom chair with good posture and alignment without external supports with stand-by supervision for at least 15 minutes. *Id.* at 706. As of May 2015, R.S. could sit upright for 30 to 45 minutes in a chair with a supportive back and no arm rest, as well as on a bench without back support for 15 to 20 minutes. *Id.* at 3221.

R.S.'s June 6, 2011, Physical Therapy Progress Update from Virginia indicates that in his stander, R.S. could "push into standing with extended knees and maintain this for 3-5 seconds at a time." *Id.* at 692. R.S. also demonstrated "momentary weight bearing through his legs for standing." *Id.* In November 2011, R.S. could "assume[] weight on his legs for 1-3 seconds consistently while in his gait trainer." *Id.* at 718. As of May 2015, R.S. could stand without buckling his legs for 10 seconds to two minutes. *Id.* at 3221.

In November 2011, R.S. could "assume weight on his legs briefly when transitioning between equipment with maximum adult support." *Id.* at 718. R.S.'s 2015 FIE reported that R.S. had "made nice progress in his ability to assist with transitional movements." *Id.* at 3143. For example, "When coming to stand from the floor, [R.S.] will assist by pushing through his legs after he is brought over his feet and elevated the first 30 degrees." *Id.* "Standing pivot transfers require minimal assistance to contact guard assistance once feet are correctly positioned." *Id.*

#### (4) Fine Motor Skills

R.S. also showed improvement in his fine motor skills while enrolled in the District. In May 2011, R.S. required hand over hand assistance for fine motor tasks, including table top tasks, retrieving food from a bowl, grasping items, maintaining a grasp on items, and releasing items. AR 690. In June 2011, after three six-week grading periods, R.S. demonstrated some progress or no progress on his fine motor-related IEP goals and objectives. *Id.* at 704-05.

In May 2015, R.S. could maintain a grasp on an item from three seconds to a few minutes. *Id.* at 3220. R.S.'s 2014 IEP and May 2015 FIE reflect that R.S. only required prompting/facilitation at the elbow to initiate a scoop, and was then able to bring the spoon to his mouth with good accuracy to take a bite. *Id.* at 2914, 3145. R.S. also demonstrated an increase in the items that he would reach for and grasp. *Id.* at 3146.

#### (5) Academic Skills

Plaintiff alleges that R.S. regressed in his academic skills while attending HPISD. Pl.'s Mot. 27. Plaintiff argues that R.S. continued to regress through October 2014, and subsequent progress reports "demonstrate that R.S. made little if any headway after that point." *Id.* (citing AR 3180-3216). According to Plaintiff, in some cases, HPISD presented R.S. with goals he had

already mastered years ago in Virginia. *Id.* The Court disagrees with Plaintiff's characterization of his academic progress.

R.S.'s June 21, 2011 IEP Progress Report indicates that R.S. made some progress or did not yet demonstrate progress on each of his annual goals and short term objectives. *See id.* at 698-701. On his IEP from November 15, 2011, R.S.'s present level of performance in academic skills states:

> Strengths: [R.S.] enjoys work sessions and will participate in trials for up to 20 minutes. He benefits from animated teacher engagement and reinforcement after each completed trial. [R.S.] has mastered identifying colors, several letters (A, B, C, R, O, N, I, E, S, T, H) and numbers (1-17) when given a field of two. He can answer yes/no questions using 4x4 picture symbols about familiar pictures and in order to request preferred objects. [R.S.] benefits from having concepts paired with the written word.

> Needs: [R.S.] does not yet know his letter sounds. He still does not understand the concept of matching two pictures. [R.S.] needs to increase his sight word vocabulary to include familiar items from his environment and grade level curriculum. [R.S.] has difficult showing mastery of learned skills over time. At times, it is difficult to accurately assess his academic skills due to inattention. He also has a tendency to reach to the answer on his left before looking at both answer choices to make a decision.

*Id.* at 710.

As of May 2015, R.S. was identifying numbers one through 10 from three choices, as well as the next number in a sequence with 75 percent accuracy. *Id.* at 3220. R.S. was able to answer yes and no questions using an "app" on his AAC device. *Id.* at 3126. R.S. could also answer "where" questions with 63 percent accuracy, "what" questions with 69 percent accuracy, and "who" questions with 61 percent accuracy. *Id.* at 3218. R.S.'s May 2015 IEP included a matching goal from three choices requiring 80 percent mastery. *Id.* at 3233.

# IV. ANALYSIS

## *A. Neither Exception to the One-Year Statute of Limitations Applies*

As an initial matter, the Court affirms the SEHO's determination that the one-year statute of limitations barred any claims arising before April 13, 2014.

In Texas, parents seeking relief under the IDEA must request a due process hearing within one year of the date the complainant knew or should have known about the alleged action that serves as the basis for the request. 19 TEX. ADMIN. CODE § 89.1151(c); *see also* 20 U.S.C. § 1415(f)(3)(C) (establishing a two-year statute of limitations unless a state statute provides otherwise). There are two exceptions to the one-year statute of limitations. The statute of limitations does not apply when a parent is prevented from filing the due process complaint because: (1) the school district made specific misrepresentations that it had resolved the problem forming the basis of the complaint; or (2) the school district withheld information from the parent that was required under the IDEA to be provided to the parent. 19 TEX. ADMIN. CODE § 89.1151(d); *see also* 20 U.S.C. § 1415(f)(3)(D)(i)-(ii). It is undisputed that Plaintiff filed his request for a due process hearing on April 13, 2015. Therefore, all claims arising before April 13, 2014, are time barred unless an exception to the statute of limitations applies.

## *(1) HPISD Did Not Make Specific Misrepresentations*

For the first exception to apply, Plaintiff must demonstrate that HPISD specifically misrepresented "that it had resolved the problem forming the basis of the complaint" and that such a misrepresentation prevented Plaintiff's parents from requesting a due process hearing. 20 U.S.C. § 1415(f)(3)(D)(i). The SEHO concluded that this exception did not toll the limitations period because "[o]ther than the pleadings and the arguments of counsel, there is insufficient evidence to support an exception to the [statute of limitations]." AR 6.

The problem forming the basis of the complaint is a series of falls and injuries R.S. suffered while at school beginning in October 2012. Plaintiff argues that the District prevented his parents from requesting a due process hearing on the basis of R.S.'s falls because in October 2013, Principal Gilbert asserted to Ruth B. "that he had met with other HPISD employees to discuss and implement new protocols so that these falls and injuries would not recur." Pl.'s Mot. 33. Moreover, Plaintiff argues that after R.S. fell again in November 2013, Principal Gilbert "made specific representations that HPISD would change not only the apparatus itself, but also the safety mechanisms and proximity controls involved with Plaintiff's care." *Id.* "Relying on these specific misrepresentations, Plaintiff and his family did not request an administrative due process hearing." *Id.* After the fall occurring in November 2013, R.S. did not have any further incidents at his elementary school. However, Plaintiff did fall again during a summer program at a different elementary school in June 2014. After the incident, Plaintiff argues that "HPISD gave Plaintiff's parents further assurances in the summer of 2014 that they would do everything necessary to protect their son." *Id.* "These representations, coupled with the fact that R.S. was moving on to a new school, gave Plaintiff's parents ground to hope that their son could now move forward with both safety and success." *Id.*

The Court finds that the evidence in the record does not support Plaintiff's claim that the District made specific misrepresentations regarding its commitment to R.S.'s safety. A "misrepresentation" is defined as "[t]he act or an instance of making a false or misleading assertion about something, usually with the intent to deceive." *Misrepresentation*, BLACK'S LAW DICTIONARY (10th ed. 2014). Plaintiff does not allege or present any evidence that the District intended to mislead or deceive Plaintiff's parents. *See D.K. v. Abington Sch. Dist. ("D.K.")*, 696 F.3d 233, 246 (3d Cir. 2012) ("Therefore, we hold that in order to be excused from the statute of

limitations based on § 1415(f)(3)(D)(i) because the school 'specific[ally] misrepresent[ed] . . . that it had resolved the problem,' plaintiffs must show that the school intentionally misled them or knowingly deceived them regarding their child's progress.").

Moreover, Plaintiff does not point to any evidence that the District actually failed to implement the promised changes. Plaintiff's argument assumes that because the District told Plaintiff's parents that it would implement changes to ensure Plaintiff's safety, and because Plaintiff continued to suffer from falls and injuries, then the District must not have made any changes. However, evidence in the record demonstrates that HPISD did make changes to its safety protocol. For example, after R.S. fell in November 2013, Principal Gilbert investigated the incident, met with R.S.'s parents, and followed up on the meeting with an email regarding the steps the District was taking to ensure R.S.'s safety, including instituting a hygiene protocol, the addition of a safety belt to the changing table, and implementing a rotation that would have one staff member within arm's reach of R.S. at all times. *See* AR 4475-76, 5314, 6103-08, 6112. R.S. did not suffer any further injuries or incidents while a student at HES. *Id.* at 6107.

### *(2) HPISD Did Not Withhold Prior Written Notice*

For the second exception to apply, Plaintiff must demonstrate that HPISD withheld information from Plaintiff's parents that was statutorily required to be provided to the parents. *See* 19 TEX. ADMIN. CODE § 89.1151(d); *see also* 20 U.S.C. § 1415(f)(3)(D)(ii). The SEHO determined that this exception should not apply because "[t]he record is replete with examples and evidence of the extraordinary efforts the District undertook to collaborate and communicate with [Plaintiff's] [p]arents." AR 6.

A school district is required to provide "[w]ritten prior notice [("WPN")] to the parents of the child" whenever the school district "refuses to initiate or change[] the identification, evaluation,

or educational placement of the child, or the provision of a free appropriate public education to the child." 20 U.S.C. § 1415(b)(3)(B). Plaintiff contends that "Plaintiff's parents approached HPISD numerous times, calling attention to the repeated failure of the school district's personnel to protect R.S.'[s] safety and welfare and R.S.'[s] regression in multiple skills, both academic and otherwise." Pl.'s Mot. 34. "Plaintiff's parents made unequivocally clear that they viewed these failures as directly impacting Plaintiff's right to a [FAPE]." *Id.* Plaintiff argues that "HPISD personnel appear not to have made any substantial changes, as the injuries to R.S. multiplied and his regression continued[.]" *Id.* Therefore, Plaintiff argues that HPISD triggered the second exception by failing to meet its "very specific notification obligations" after "refus[ing] to implement measures that would impact the provision of a [FAPE]." *Id.*

The Court finds the evidence in the record insufficient to support Plaintiff's claim that the District withheld WPN of its refusal to implement the changes requested by Plaintiff's parents. Plaintiff does not identify any specific incident where WPN was required and HPISD failed to provide it. Plaintiff argues only generally that HPISD "simply refused to provide any further information at all" regarding its "refusal to implement measures that would impact the provision of a [FAPE]." Pl.'s Mot. 34. However, a review of the record reflects that HPISD provided Plaintiff and his parents with WPN each time it was required. *See* AR 2440-45, 2458-59, 2582-83, 2759-60, 2970-71, 2998-99, 3002-03.

### *(3) Plaintiff Fails to Establish that HPISD Caused his Failure to Request a Hearing*

Finally, assuming *arguendo* that HPISD did make specific misrepresentations and did withhold prior notice, Plaintiff has not demonstrated by a preponderance of the evidence that the District prevented Plaintiff's parents from requesting a due process hearing. "Establishing evidence of specific misrepresentations or withholding of information is insufficient to invoke the

exceptions; a plaintiff must also show that the misrepresentations or withholding *caused* [his] failure to request a hearing or file a complaint on time. The terms 'prevented from' and 'due to' denote a causation requirement." *D.K.*, 696 F.3d at 246.

The Court agrees with the SEHO that "[t]he record is replete with examples and evidence of the extraordinary efforts the District undertook to collaborate and communicate with [Plaintiff's] [p]arents." AR 6. HPISD provided Plaintiff's parents with copies of the procedural safeguards at every appropriate juncture. *See id.* at 2460-75, 2483-84, 2486-87, 2584-87, 2768-69, 2981-95, 3278-85. The procedural safeguards thoroughly outline the rights of students and parents and the process for resolving disagreements, including mediation and requesting a due process hearing. *See, e.g., id.* at 3287-305. Moreover, Plaintiff was represented by an advocate from Disability Rights Texas at the October 31, 2013, ARD meeting. *Id.* at 2453. Plaintiff fails to provide to any evidence or explanation as to how the District prevented Plaintiff's parents from requesting a due process hearing or interfered with their ability to do so.

The one-year statute of limitations began running one year before the date the due process complaint was originally filed—April 13, 2015. The Court finds that Plaintiff has failed to demonstrate by a preponderance of the evidence that either exception to the statute of limitations applies in this case. Therefore, the Court affirms the conclusion of the SEHO that all of Plaintiff's claims arising before April 13, 2014, are time barred by the statute of limitations.

### B. The District Did Not Deny R.S. a FAPE

"To meet its substantive obligation under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F.*, 137 S. Ct. at 999. "The 'reasonably calculated' qualification reflects a recognition that crafting an appropriate program of education requires a prospective judgment by school officials.

The Act contemplates that this fact-intensive exercise will be informed not only by the expertise of school officials, but also by the input of the child's parents or guardians." *Id.* (internal citations omitted). "Any review of an IEP must appreciate that the question is whether the IEP is *reasonable*, not whether the court regards it as ideal." *Id.* (citation omitted).

The IEP must aim to enable the student to make progress. *Id.* For most children, a FAPE will involve integration in the regular classroom and individualized special education calculated to achieve advancement from grade to grade. *Id.* at 1000. If full integration in the regular classroom and achievement on grade level is not a reasonable prospect for a child, his IEP need not aim for grade-level advancement. *Id.* But his educational program must be appropriately ambitious in light of his circumstances, just as advancement from grade to grade is appropriately ambitious for most children in the regular classroom. *Id.* The goals may differ, but every child should have the chance to meet challenging objectives. *Id.*

The Supreme Court has not adopted a bright-line standard for determining what "appropriate" progress looks like from case to case. *Id.* at 1001. The adequacy of a given IEP turns on the unique circumstances of the child for whom it was created. *Id.* However, "[w]hen all is said and done, a student offered an educational program providing merely more than *de minimis* progress from year to year can hardly be said to have been offered an education at all." *Id.* (internal quotation marks omitted). "For children with disabilities, receiving instruction that aims so low would be tantamount to 'sitting idly . . . awaiting the time when they were old enough to 'drop out.'" *Id.* (quoting *Rowley*, 458 U.S. at 179). The IDEA demands more. *Id.*

The Fifth Circuit uses a four-factor test established in *Michael F.* to evaluate whether an IEP substantively complies with the IDEA. *Renee J. ex rel. C.J. v. Hous. Indep. Sch. Dist.* ("*Renee*

*J*."), 913 F.3d 523, 529 (5th Cir. 2019).[3] The factors include whether: (1) the student's program is individualized on the basis of the student's assessment and performance; (2) the program is administered in the LRE; (3) the services are provided in a coordinated and collaborative manner by the key stakeholders; and (4) positive academic and non-academic benefits are demonstrated. *Id.* The Fifth Circuit has "not held that district courts must apply the four factors in any particular way," but only "that these factors are 'indicators' of an IEP's appropriateness, intended to guide a district court in the fact-intensive inquiry of evaluating whether an IEP provided an educational benefit." *Michael Z.*, 580 F.3d at 294. However, the Fifth Circuit has long held that the fourth factor is critical. *Renee J.*, 913 F.3d at 529 (citing *R.P. v. Alamo Heights Indep. Sch. Dist.*, 703 F.3d 801, 813-14 (5th Cir. 2012).

### *(1) R.S.'s IEP Was Individualized on the Basis of His Assessments and Performance*

The IDEA mandates that in developing a student's IEP, the IEP team shall consider: "(i) the strengths of the child; (ii) the concerns of the parents for enhancing the education of their child; (iii) the results of the initial evaluation or most recent evaluation of the child; and (iv) the academic, developmental, and functional needs of the child." 20 U.S.C. § 1414(d)(3)(A).

In developing R.S.'s IEP, the ARDC relied on the District's evaluations, R.S.'s PLAAFPs, and outside reports, which included the 2012 FIE, the 2014 FBA, the 2014 O&M Evaluation, the 2015 FIE, the TSBVI Outreach Program Consultation Reports, the 2015 Functional Vision Evaluation and Learning Media Assessments, and the Dallas Services Eye Exam report. *See* AR 41-42, 2259-61, 2273-327, 2331-34, 2589-619, 2623-25, 2776-79, 2828-30, 3032-66, 3086-3179, 3218-22. The ARDC also solicited input from R.S.'s parents at collaboration meetings prior to

---

[3] The Fifth Circuit recently reaffirmed the validity of the *Michael F.* test in light of the Supreme Court's ruling in *Endrew F. See Renee J.*, 913 F.3d at 529 (citing *E.R. v. Spring Branch Indep. Sch. Dist.*, 909 F.3d 754 (5th Cir. 2018)).

ARDC meetings, and from R.S.'s private therapists and specialists. *See id.* at 2426, 2429, 2764, 3308-09, 3973, 6088-89, 92. Based on this information, R.S.'s ARDC drafted IEP goals and objectives, reached agreement on the IEP goals and objectives, and provided R.S. with special education and related services accordingly. *See id.* at 2426-31, 2433-38, 2453-56, 2458-59, 2481, 2578-80, 2582-83, 2759-60, 2764-66, 2772-74, 2996-3003, 3259-3271.

Plaintiff, however, contends that HPISD was incapable of providing R.S. an IEP individualized on the basis of his assessment and performance because HPISD: (1) did not take sufficient account of the serious risk of injury to R.S. to ensure minimization of that risk; (2) did not take sufficient account of R.S.'s demonstration of skills in his prior educational environment, such that it did not recognize the regression R.S. was experiencing until it was too late; and (3) did not fully implement the recommendations provided by its own evaluators and outside consultants. Pl.'s Mot. 35-36. The Counts finds that Plaintiff's contentions are not borne out by the evidence in the record.

As to Plaintiff's safety argument, two of the falls incurred by R.S. during his time at HPISD fall within the applicable statute of limitations—R.S.'s fall off the Kaye bench in June 2014, and R.S.'s fall in his "office chair" in September 2014. The Court finds that Plaintiff has not demonstrated how these incidents rendered HPISD incapable of providing R.S. with an individualized IEP and thus, denied him a FAPE.

Plaintiff relies heavily on the testimony of his expert, Dr. van Dijk, to make the argument that the injuries R.S. suffered "constitute the type of stressors that would have such a long term negative impact and interfere with learning, in part by raising the level of cortisol in the brain that has such damaging impact on learning." Pl.'s Mot. 38 (citing AR 1750, 5453-56). Plaintiff argues that the SEHO "ignored Plaintiff's evidence and argument on this point, including the evidence

presented by Dr. van Dijk concerning the inevitable impact of Plaintiff's injuries at HPISD on his stress levels and the resultant effect on his ability to learn." *Id.* at 39. While Plaintiff criticizes the SEHO for ignoring Dr. van Dijk's testimony, it is within the SEHO's discretion to make credibility determinations regarding witnesses. *See Renee J. ex rel. C.J. v. Hou. Indep. Sch. Dist.*, 333 F. Supp. 3d 674, 699 (S.D. Tex. 2017). In the Court's own review of Dr. van Dijk's testimony, the Court notes that Dr. van Dijk emphasized that he conducted only a very informal and abbreviated observation of R.S., not a formal evaluation and assessment. AR 5404, 5436-37, 5461. Dr. van Dijk testified that he premised his opinions entirely on the assumption that the allegations contained in the Request for Due Process Hearing were accurate. *Id.* at 5472-73. Moreover, Dr. van Dijk testified that he did not realize R.S. was attending Chase's Place at the time of his observation. *Id.* at 5475.

Beyond the opinions of Dr. van Dijk, Plaintiff points to no other evidence in the record to support his argument that the June 2014 and September 2014 falls denied R.S. a FAPE. There is no evidence in the record of any long-term effect of R.S.'s injuries on his health or ability to learn. Rather, the evidence in the record undercuts this argument. For example, R.S. returned to class for the remainder of the day following the September 2014 incident. *Id.* at 4409. Moreover, Boudreaux testified that she did not witness any indication that R.S. suffered a concussion as a result of his injuries, and to her knowledge, neither the school nor the nurses received documentation from a physician that R.S. suffered a concussion. *Id.* at 6248-49. There is also testimony from Baltisberger that during his four visits to HPISD, he never observed anything unsafe for R.S., and that "[t]here was always an adult with him, always. There was always an adult . . . very close to him." *Id.* at 5791-92. Finally, Estrada testified that the District's Special

Ed Parent Advisory group never raised any safety concerns, and there was no documentation that there was an ill intent or neglect by HPISD staff. *Id.* at 6394.

The Court understands that any time a child is injured at school, it can be alarming for both the student and parents, especially if the child, like R.S., does not have protective instincts. However, the Court also notes that TSBVI's General Orientation and Mobility Recommendations for Functional Programs given to R.S.'s ARDC emphasizes that parents and schools should "[l]et safe accidents happen." *Id.* at 3065. The recommendations explain,

> We learn from mistakes and if we prevent a child from having accidents occur, we are depriving them of the opportunity to learn from the mistake or accident. If a child is walking on the playground and tumbles on the ground due to a change in elevation, they learn what it is to fall, they learn how to get up, and with enough occurrences they learn to shift their balance and prevent themselves from falling. It has to be lived, to be learned. Certainly there are some accidents that are beyond the scope of safety, such as the fall from the top of the swing set or stepping into a street with moving vehicles. These are indeed areas the adult should intervene. But, if an accident will not result in bodily harm it can be an opportunity for learning to occur. Sometimes we pre-teach a skill to a child, such as a protective technique that includes bringing the hand up in front of the head to prevent bumping into a table when bending down; generally the skill is only truly acquired when the child bumps the table with their head and is able to make the connection within themselves that bringing the hand up before bending down could prevent the bump in the future. If as adults we always provide the prompt or cue to implement the protective technique for them to avoid bumping their head, we are interfering with the natural learning process.

*Id.* at 3065-66. These recommendations from TSBVI are in line with Boudreaux's testimony that, "When you're learning a skill, you are at risk to have an incident." *Id.* at 6290. All children are at risk for suffering from minor falls, bumps, and bruises while at school, especially when exploring and interacting with the world around them. There is no evidence in the record that the falls and injuries suffered by R.S. were "beyond the scope of safety." *Id.* at 3065.

The Court agrees with the SEHO's statement that, "The numerous accidents and minor injuries [R.S] suffered while attending District schools were unfortunate and troubling; they are

also somewhat understandable in the sense that [R.S.] is an outgoing, friendly, and active child who has multiple physical challenges." *Id*. at 40. The SEHO concluded, "The numerous accidents and minor physical injuries suffered by [R.S.] at District schools did not threaten [R.S.'s] health in a manner that undermined his ability to learn and did not rise close to the level of denying [R.S.] a FAPE." *Id*. The Court finds that the evidence in the record supports this conclusion.

With regard to Plaintiff's regression argument, any regression occurring before April 13, 2014, is outside the one-year statute of limitations. Moreover, the Court agrees with the SEHO's finding that the District "provided adequate compensational services to correct the regression" through TSBVI consultations. *Id*. at 19, 36.

Finally, Plaintiff's argument that HPISD failed to implement the recommendations provided by its evaluators and outside consultants is not supported by the evidence in the record. Baltisberger testified that by his final visit, HPISD "really seemed to be hitting their stride" in implementing his recommendations and adopting Active Learning strategies. *Id*. at 5785. The evidence in the record also reflects that HPISD held trainings, collaboration meetings, and consultations and observations from District specialists following R.S.'s ARDC meetings to ensure staff and teachers were capable of implementing R.S.'s objectives and goals. *See id*. at 3395-412, 3754-948, 3949-59, 3970-76.

The Court finds that Plaintiff has failed to meet his burden in establishing that R.S.'s IEP was not individualized on the basis of his assessments and performance. Therefore, the first *Michael F.* factor weighs in favor of the District.

### *(2) R.S.'s IEP Was Implemented in the LRE*

Pursuant to the IDEA, a student must be educated in the "least restrictive environment" appropriate to meet his needs. 20 U.S.C. § 1412(a)(5)(A). Specifically, the IDEA mandates that:

To the maximum extent appropriate, children with disabilities . . . are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

*Id.*

"The IDEA's strong preference in favor of mainstreaming must 'be weighed in tandem with the Act's principal goal of ensuring that the public schools provide [disabled] children with a free appropriate education." *Juan P.*, 582 F.3d at 586 (quoting *Daniel R.R. v. State Bd. of Educ.*, 874 F.2d 1036, 1044-45, 1048 (5th Cir. 1989)). In determining whether an IEP's placement of a student with disabilities is in the LRE, the Court's analysis should be "an individualized, fact-specific inquiry that requires [it] to examine carefully the nature and severity of the child's handicapping condition, his needs and abilities, and the schools' response to the child's needs. " *Daniel R.R.*, 874 F.2d at 1048.

Plaintiff argues that HPISD did not offer to administer R.S.'s IEP in the LRE appropriate to his needs, in particular because "HPISD did not provide R.S. meaningful interaction with his peers." Pl.'s Mot. 42. The Court disagrees. Although R.S.'s IEP included placement in the special education setting for approximately 87 percent of the school day, R.S. had opportunities for meaningful interactions with his general education peers. AR 3249-50.

At HES, HPISD utilized "reverse inclusion" for R.S., where R.S.'s general education peers would come to lunch with R.S. in the Lift Classroom. *Id.* at 5896, 6093. R.S. also had interaction with his general education peers in the general education classroom, on school field trips, on the playground, and during all school assemblies. *Id.* at 6123-24, 6150-54. MIS had a peer tutor program where general education students applied to spend a period of their day with students with special needs. *Id.* at 6399-400. As a result, even when R.S. was in the special education setting,

he had interaction with his general education peers. In math class, R.S. had two to three general education peer tutors with him every day. *Id.* at 3249-50, 6331, 6338-39. In addition to PE in the general education environment for 150 minutes a week, R.S. also received 30 minutes of adaptive PE each week. *Id.* at 3249-50. During adaptive PE, R.S. worked and interacted with general education peer tutors as well. *Id.* at 6356. R.S. also had opportunities for interacting with his general education peers during his job delivering items with his assistant, and in the cafeteria at lunch. *Id.* at 5895, 6400. Although R.S. often ate in the special education classroom with a peer, he still went to the cafeteria for the social aspect of the lunch period. *Id.* at 5895.

Plaintiff failed to present sufficient evidence that his educational placement was inappropriate in any way or more restrictive than what R.S. required to make progress on his goals and objectives. The Court finds that the evidence in the record supports the SEHO's finding that, "Given the level of support and assistance that [R.S.] requires to progress in his IEP goals, overall the District has mainstreamed [R.S.] to the maximum extent possible." *Id.* at 37. Therefore, the second *Michael F.* factor weights in favor of HPISD.

### (3) R.S.'s Services Were Provided in a Coordinated and Collaborative Manner

The IDEA provides that the IEP team (referred to as an ARDC in Texas) consist of the parents, at least one regular education teacher of the student, at least one special education teacher of the student, a representative of the school district who is qualified to provide specially designed instruction and is sufficiently knowledgeable about the general education curriculum and availability of resources, and an individual who can interpret the instructional implications of evaluation results. 20 U.S.C. § 1414(d)(1)(B). In addition, at the parents' or school district's discretion, the ARDC may include other individuals who have knowledge or special expertise regarding the student. *Id.*

Plaintiff argues that HPISD failed to offer services to R.S. in a manner coordinated and collaborative with R.S.'s parents and private providers. Pl.'s Mot. 43. The Court disagrees. The record is replete with examples of coordination and collaboration between HPISD, Plaintiff's parents, outside consultations, and Plaintiff's private specialists.

In developing R.S.'s IEP, the ARDC collaborated with District staff, Plaintiff's parents, and outside providers and consultations. *See* AR 2491-99, 2595-619, 3052-66, 3086-93, 3308-09, 3754-954, 3970-4047, 4480-82, 5853-57, 5872, 5879, 5903-04, 5906-07, 6082-83, 6088-89, 6092, 6094, 6114-16, 6171-72. Input was sought from R.S.'s teachers and specialists, including his speech pathologist, occupational therapist, physical therapist, adaptive PE teacher, AT specialist, music therapist, O&M specialist, behavior specialist, TVI, and TSBVI Outreach Program consultants. *Id.* In addition to ARDC meetings, the HPISD staff collaborated with Plaintiff's parents and considered parental input during monthly "collaboration meetings." *See id.* at 4480-81, 4553, 6092, 6116. The District sent draft IEP documents to Plaintiff's parents prior to his ARDC meetings, and incorporated their feedback into R.S.'s IEPs. *See id.* at 4484-504, 4558-63, 4571-75.

At least one of Plaintiff's parents participated in every ARDC meeting. *Id.* at 2426, 2439, 2453, 2481, 2578, 2764, 2967-69, 2978, 3067, 3072, 3253-56. In order to collaborate with Plaintiff's parents, the District typically scheduled R.S.'s ARDC meetings on Fridays so that Cdr. S. could travel in from out of town, even though Fridays were not the usual ARDC meeting day at HES. *Id.* at 6088. The ARDC meetings lasted up to several days. *Id.* at 6088-89. The ARDC meeting documentation reflects extensive parental input and requests for consideration, which almost always resulted in input being incorporated into R.S.'s IEP. *See id.* at 2426-38, 2956-66, 3259-71.

The District staff who implemented R.S.'s IEP collaborated closely with each other through team meetings and with outside service providers. *See, e.g., id.* at 3754-948 (observations and consultations from TVI), 3949-59 (observations and consultations from O&M specialist), 3970-76 (communication log from physical therapist). Following ARDC meetings, the District ran numerous trainings to for staff and teachers working with R.S. on his unique needs, safety issues, and equipment. *See, e.g., id.* at 3395-412; *cf. Juan P.*, 582 F.3d at 587 (affirming district court's conclusion that school district provided services that were not coordinated and collaborative where IEP committee participants failed to communicate and collaborate outside of meetings and district staff struggled with training and follow up"). R.S.'s specialists and teachers frequently communicated and collaborated with R.S.'s parents, caretakers, and private therapists regarding his equipment, his progress, and any health issues and concerns. *See, e.g., id.* at 3970-76, 5857-58, 5906, 6180-86. The Court also notes that HPISD hired a private caregiver who was working with R.S. at home to be his aide at school. *Id.* at 6293.

It is undisputed that Plaintiff's parents expressed their disagreement and concerns with R.S.'s progress, goals, and objectives on numerous occasions. "[T]he IDEA 'imposes extensive procedural requirements' designed to provide parents with an opportunity for meaningful input[.]" *Rockwall Indep. Sch. Dist. v. M.C. ex rel. M.C.*, 816 F.3d 329, 339 (5th Cir. 2016) (quoting *Buser ex rel. Buser v. Corpus Christi Indep. Sch.*, 51 F.3d 490, 493 (5th Cir. 1995)). However, the "right to provide meaningful input is simply not the right to dictate an outcome and obviously cannot be measured by such." *White*, 343 F.3d at 380. "Absent any evidence of bad faith exclusion of the parents or refusal to listen to or consider the [parents'] input, [the school district] [meets] IDEA requirements with respect to parental input." *Id.* Here, Plaintiff has provided no evidence of bad faith exclusion of his parents or a refusal by the District to listen to or consider his parents' input.

The Court finds that the evidence in the record supports the SEHO's conclusion that, "The District went to extraordinary lengths to include [R.S.'s] [p]arents in [R.S.'s] entire educational program and satisfied all collaboration requirements." *Id.* at 41. Plaintiff has not met his burden in establishing that HPISD failed to collaborate and coordinate with key stakeholders in implementing his IEP. Therefore, the third *Michael F.* factor weighs heavily in favor of the District.

### *(4) R.S. Demonstrated Positive Academic and Non-Academic Benefits under his IEP*

The final *Michael F.* factor is the point of greatest disagreement between Plaintiff and the District. Plaintiff alleges that he suffered severe regression during his time enrolled in HPISD, particularly with respect to his communication skills, vision, mobility, academic goals, and emotional state. *See* Pl.'s Mot. 25-29. As a result, Plaintiff argues that HPISD failed to offer him a reasonable likelihood of positive academic and non-academic benefits. *Id.* at 45. The Court, however, finds that the evidence in the record does not support Plaintiff's position.

The Court commends Plaintiff's parents for acting as fierce advocates for their child and consistently pushing for challenging and meaningful goals to be included in his IEP. However, R.S.'s records from his school district in Virginia do not support the level of skill and progress Plaintiff alleges he had achieved before his enrollment in HPISD. R.S.'s November 2011 IEP from Virginia even notes that R.S. "has difficulty showing mastery of learned skills over time," and that "it is difficult to accurately assess his academic skills due to inattention." *Id.* at 710. R.S. continued to demonstrate inconsistent progress during his time at HPISD. *See, e.g., id.* at 2428. His skill level varied greatly depending on his familiarity with the concept. *See, e.g., id.* at 6019-20. Consequently, it appears to the Court that there was disconnect and disagreement between

Plaintiff's parents and HPISD staff regarding R.S.'s progress, regression, and current ability levels. *See, e.g., id.* at 5760-61.

As a result of R.S.'s multiple disabilities, his accomplishments happen more slowly and incrementally, with the "big gains" occurring over a number of years or long periods of time. *Id.* at 5793. Despite periods of regression and varied performance on assessments, overall, R.S. demonstrated growth in his communication skills, mobility, and fine motor skills, in addition to making academic progress. *See supra* § III.H. The Court finds that the evidence in the record establishes that R.S. demonstrated positive academic and non-academic benefits under his IEP. Therefore, the final *Michael F.* factor weighs in favor of HPISD.

Considering the evidence and its bearing on the four *Michael F.* factors, the Court concludes that R.S.'s IEP was reasonably calculated for him to receive meaningful educational benefits, and thus provided him with a FAPE in accordance with IDEA.

### C. Private Placement

As discussed above, the evidence in the record establishes that HPISD provided R.S. with a FAPE at all relevant times. Thus, the Court does not need to reach the question of whether private placement at Chase's Place was appropriate under the IDEA. *See Hovem*, 690 F.3d at 396 (citing *Sch. Comm. of Burlington*, 471 U.S. at 369). However, assuming *arguendo*, that Plaintiff did establish a violation of the IDEA, the Court finds that Plaintiff still is not entitled to reimbursement for R.S.'s private placement because he did not establish that Chase's Place is an appropriate placement under the IDEA.

Most significantly, Chase's Place did not individualize R.S.'s educational program on the basis of his assessment and performance. Chase's Place did not evaluate R.S. to determine his goals. AR 5609-10. There is also no indication from evidence in the record that Chase's Place

collects data to measure R.S.'s progress. *See id.* at 5591, 5619-20. Moreover, Chase's Place is not utilizing Active Learning strategies, which both Baltisberger and Dr. van Dijk testified is necessary for R.S.'s progress. *See id.* at 5613.

The Court also notes that the evidence indicates that Chase's Place may be underfunded and understaffed. *Id.* at 5358-59. The record is devoid of any evidence that Chase's Place employs a physical therapist, a TVI, an O&M specialist, an AT specialist, an adaptive PE teacher, a music therapist, or a 1:1 aide, even though these specialists are necessary for R.S. to receive an appropriate education. *See id.* at 3250.

Finally, Chase's Place fails to provide R.S. with services in the LRE as all students attending Chase's Place are students with disabilities. *Id.* at 5626.

The Court finds that even if the District violated the IDEA, Plaintiff still is not entitled to reimbursement for his tuition to Chase's Place and private supplemental services because he has failed to meet his burden in establishing that Chase's Place is an appropriate placement.

## V. CONCLUSION

For the reasons stated above, the Court finds that Plaintiff has failed to prove by a preponderance of the evidence that HPISD denied R.S. a FAPE in violation of the IDEA. The Court affirms the decision of the SEHO in the underlying due process hearing. Therefore, the Court grants Defendant HPISD's Motion for Judgment on the Administrative Record [ECF No. 20], and denies Plaintiff's Motion for Summary Judgment [ECF No. 22].

**SO ORDERED.**

SIGNED March 8, 2019.

KAREN GREN SCHOLER
**UNITED STATES DISTRICT JUDGE**